Scott C. Borison (SBN 289456)
1900 S. Norfolk St. Suite 350
San Mateo CA 94403
(301) 620-1016
Scott@borisonfirm.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MATTHEW P. MALDONADO**, on behalf of himself and those similarly situated, <br><br> Plaintiff <br><br> v. <br><br> **NEWREZ LLC D/B/A SHELLPOINT MORTGAGE**, <br> 1100 Virginia Dr., Suite 125 <br> Fort Washington, PA 19034 <br> <u>Serve On</u> <br> CSC-Lawyers Incorporating Service, Resident Agent <br> 2710 Gateway Oaks Dr., Suite 150N <br> Sacramento, CA 95833 | Case No. ___5:21-cv-642_____ <br><br><br> **CLASS ACTION COMPLAINT** |

Plaintiff Matthew P. Maldonado ("**Maldonado**") ("**Plaintiff**" or "**Named Plaintiff**"), on his individual behalf and on behalf of similarly situated individuals defined *infra*, by his attorney, Scott Borison and pursuant to Fed. R. Civ. P. 23 (Class Actions), sues NewRez LLC (f/k/a New Penn Financial, LLC) d/b/a Shellpoint Mortgage Servicing ("Shellpoint" or "Defendant"). The Plaintiff individually and on behalf of himself and similarly situated persons, alleges and states as follows:

## INTRODUCTION

1. In instances, such as the underlying matters involving Shellpoint, a mortgage servicer places its interest above the remedial rights of homeowners and

**Class Action Complaint**

consumers and engages in a pattern of unsafe and unsound mortgage service practices. Moreover, Shellpoint unfairly and deceptively ignores its statutory and contractual duties including those which were agreed to as part of its license(s) to legally operate in the State of California and nationwide.

2.     These practices are compounded when homeowners, like Maldonado, and the putative class members, are entitled to certain protections and accurate information about their mortgages but Shellpoint knowingly and recklessly utilizes inaccurate information transferred to it by its predecessors and thereby infects the true status of the mortgages transferred to it and demands sums not lawfully due and owing from borrowers because it has performed no reasonable investigation into the inaccurate mortgage loan data it acquires, with knowledge of its inaccuracies,  and then imports the inaccurate data into its computer systems.

3.     Shellpoint is a mortgage servicer subject to the Real Estate Settlement Procedures Act, 12 U.S.C.A. §§ 2605, 2609 ("RESPA") and its implementing regulations. Specifically, Shellpoint:

a.     Is required to maintain policies and procedures that are reasonably designed to provide accurate disclosures to borrowers.  12 C.F.R. § 1024.38(a)-(b).

b.     Is required to maintain policies and procedures that ensure it is receiving accurate information to its predecessor servicers.   12 C.F.R. s. 1024.38(b)(4)(ii).

4.     Shellpoint is also a debt collector in relation to the Named Plaintiff and the putative class members pursuant to the Fair Debt Collections Practices Act ("FDCPA") as defined below.  As a debt collector, Shellpoint "may not use unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C.A. § 1692f.

5.     There is no question that RESPA was intended and is considered remedial legislation. *See e.g. Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719

**Class Action Complaint**

(6th Cir. 2013)("As a remedial statute, RESPA is construed broadly to effectuate its purposes"); *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-66 (9th Cir. 2012)("RESPA's provisions relating to loan servicing procedures should be 'construed liberally' to serve the statute's remedial purpose").  *See also* DODD–FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT, PL 111-203, July 21, 2010, 124 Stat 1376.  Dodd-Frank was specifically enacted to "improv[e] accountability and transparency in the financial system…[and] to protect consumers from abusive financial services practices." *Id.*

6.     Yet, as a matter of standard policy and practice, Shellpoint disregards the express requirements in 12 U.S.C.A. § 2605(c)(k), and 12 C.F.R. § 1024.38(a)-(b) in relation to the Plaintiff and putative class members by (i) failing to timely and reasonably identify itself to federally related mortgage borrowers, (ii) knowingly utilizing incorrect loan data transferred to it without making without any reasonable investigation to correct the inaccuracies, and (iii) imposing loan charges and fees to the borrowers which it is barred from imposing.  Shellpoint knows that the information transferred to it by its predecessor servicers is infected and prone to multiple errors but takes no reasonable steps to correct those errors but simply compounds the errors by utilizing the flawed data as part of its loan servicing business practice and routine.

7.     As a direct and proximate result of Shellpoint's violations of its mortgage servicing duties as described herein, Plaintiff and the putative class members he represents herein have been harmed by Shellpoint's (i) knowing utilization of incorrect loan data obtained by its predecessor(s) servicers while imposing and collecting improper fees and charges to the Named Plaintiff's and the putative class members' loan accounts with no proper notice to them; (ii) reporting of same derogatory information to the credit reporting agencies while not disclosing the information to the borrowers; and (iii) concealment of material loan information to Named Plaintiff and class members.  These damages include statutory damages

**Class Action Complaint**

1  available pursuant to 12 U.S.C.A. § 2605(f), 15 U.S.C.A. § 1692k, and actual
2  damages equal to the fees and charges imposed and/or collected by Shellpoint.

3  **JURISDICTION AND VENUE**

4      8.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 since certain
5  of the claims asserted herein arise under the laws of the United States.  The Court
6  also has supplement jurisdiction over the state law claims asserted herein pursuant
7  to 28 U.S.C. § 1367(a).

8      9.    Venue is proper in this Court as the acts and conduct alleged herein in
9  relation to the Named Plaintiff and certain California putative class members
10  occurred in California.

11      10.    Maldonado had previously sought to attempt to voluntarily add certain
12  of his claims herein in a matter pending in the United States District Court for the
13  District of Maryland but those claims were dismissed by that court without prejudice
14  for lack of jurisdiction.  *RICHARDS v. NEWREZ LLC d/b/a SHELLPOINT*
15  *MORTGAGE SERVICING*, No. CV ELH-20-1282, 2021 WL 1060286, at *17 (D.
16  Md. Mar. 18, 2021)("*Richards Action*").  The holding and rationale for dismissal of
17  Maldonado from the *Richards Action* was subsequently called into question by *Ford*
18  *Motor Co. v. Montana Eighth Jud. Dist. Ct.*, No. 19-368, 2021 WL 1132515, at *9
19  (U.S. Mar. 25, 2021)("the 'relationship among the defendant, the forum[s], and the
20  litigation'—is close enough to support specific jurisdiction").  Under the
21  circumstances, by promptly refiling his claims in this Court after being dismissed
22  from the *Richards Action* (to which he was a putative class member and had every
23  right to intervene and join), Maldonado is individually entitled to equitable tolling
24  of certain of his claims since he acted diligently in pursuing his rights and claims as
25  a putative class member voluntarily joining the *Richards Action*. The Defendant also
26  had notice of his claims based on the prior filing.

27
28

**Class Action Complaint**

**PARTIES**

11.    Plaintiff Matthew Maldonado is a natural person who owns the real property known as 4562 Hastings Court, Chino, CA   91710 ("Maldonado Property").  Maldonado is also the borrower on the mortgage loan subject to this action which is associated with the Maldonado Property and was utilized entirely for personal, household and family purposes ("Maldonado Loan").  The Maldonado Loan is a federally related mortgage and Shellpoint collects on the loan as a third party collector on behalf of another. Maldonado's undersigned counsel also has worked as co-counsel with Maldonado's wife in other matters.

12.    Shellpoint is a wholly owned subsidiary of Shellpoint Partners LLC, a Delaware limited liability company. Shellpoint Partners LLC is wholly owned by NRM Acquisition LLC and NRM Acquisition II LLC, both of which are Delaware limited liability companies. Both NRM Acquisition entities are wholly owned by New Residential Mortgage LLC, a Delaware limited liability company. New Residential Mortgage LLC is wholly owned by New Residential Investment Corporation, a Delaware corporation. New Residential Investment Corporation is publicly traded on the New York Stock Exchange under the ticker symbol NRZ.  In addition:

a.    NRZ advertises on its website the reason why it is focused on Shellpoint's business model which acquires the mortgage servicing rights from others.  "A mortgage servicing right (MSR) provides a mortgage servicer with the right to service a pool of residential mortgage loans in exchange for a portion of the interest payments made on the underlying residential mortgage loans. Advances are required capital outlays by the servicer to fund missed payments from delinquent borrowers and foreclosure-related expenses. The servicer has limited risk of not being reimbursed for advances, because advances are almost always 'top of the waterfall' in the event of a property sale" (https://www.newresi.com/about-us).  In other words, Shellpoint makes more money on behalf of NRZ by churning fees and

**Class Action Complaint**

making advances related to borrowers it believes are delinquent or in foreclosure and there is "limited risk" that those sums will not be reimbursed to it—even if it has no right to impose the fees and charges in the first instance.

b.    Shellpoint is a mortgage lender and servicer licensed by the State of California.  Shellpoint is also a mortgage servicer as defined by Cal. Civ. Code § 2920.5(a).

c.    Shellpoint is a debt collector pursuant to 15 U.S.C. §1692a(6) as it acquired the servicing right to the Plaintiff's loan and certain of the similarly situated persons he represents when it believed the loans were delinquent or in default.  Shellpoint also collects not on its own behalf in relation to the Plaintiff and certain similarly situated persons he represents but collects on behalf of others who own the subject mortgage debts and who have engaged Shellpoint to collect on their behalf.

d.    Shellpoint is a mortgage servicer subject to RESPA and the remedies and protections for borrowers stated in 12 U.S.C.A. § 2605.

## FACTUAL ALLEGATIONS

### *General Allegations About Shellpoint's Knowledge*

13.    All persons, including licensed mortgage lender/servicers in the State of California like Shellpoint, are expected to know the law—including the laws governing their activities.

14.    Pursuant to 12 C.F.R. § 1024.38(b)(1)(i), Shellpoint is required to "[p]rovide accurate and timely disclosures to a borrower as required by [12 C.F.R. § 1024.38] or other applicable law."  Pursuant to 12 C.F.R. § 1024.35(b)(5), Shellpoint is not permitted to "impos[e]… a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower."  It is unreasonable and a violation of its duties for Shellpoint to impose and collect sums never properly disclosed to the borrower, waived by its predecessor, or to simply impose and collect fees from

**Class Action Complaint**

a borrower based on the knowingly inaccurate information acquired by it from its predecessors.

15.     Pursuant to 12 U.S.C.A. § 2605(c)(1), Shellpoint "shall notify the borrower of any such assignment, sale, or transfer" of their mortgage loan.

16.     Pursuant to 12 U.S.C.A. § 2605(k)(1)(C)(E), Shellpoint has duties to the Plaintiff and putative class members to (i) take appropriate steps to avoid foreclosure as part of its standard servicer's duties and (ii) comply with any other obligation(s) found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of 12 U.S.C.A. § 2605.  Amongst these obligations are the servicer's duties to comply with state laws and regulations that are not expressly preempted by RESPA; in other words, Congress and the CFPB expressly intended for RESPA to work in concert with state regulation.  *See e.g.* 12 U.S.C.A. § 2605(h) and 12 C.F.R. § 1024.33(d) (expressly limiting preemption to certain notice issues).

17.     Shellpoint has a further duty to send periodic statements to the Plaintiffs and putative class members identifying certain information as required by 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41.[1]

18.     Shellpoint is also aware that it owes certain duties to homeowners under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Public Law No: 116-136.  Specifically:

"…a borrower with a Federally backed mortgage loan experiencing a financial hardship due, directly or indirectly, to the COVID–19 emergency may request forbearance on the Federally backed mortgage loan, regardless of delinquency status, by (A) submitting a request to the borrower's servicer;

---

[1]     The CFPB official interpretation of 12 CFR § 1026.41(a) states that:

"The periodic statement requirement in § 1026.41 applies to the 'creditor, assignee, or servicer as applicable.' The creditor, assignee, and servicer are all subject to this requirement ….., but only one statement must be sent to the consumer each billing cycle. When two or more parties are subject to this requirement, they may decide among themselves which of them will send the statement."

**Class Action Complaint**

1  and (B) affirming that the borrower is experiencing a financial hardship
2  during the COVID–19 emergency."

3  Section 4022 of the CARES Act.

4  19.  Under the CARES Act, servicers like Shellpoint are required to grant
5  forbearance for an initial period of up to 180 days, and borrowers can request an
6  additional extension of 180 days. The borrower also has the option at any time to
7  shorten the forbearance period and resume payments. To request forbearance,
8  borrowers do not need to provide any documentation showing their hardship and
9  only have to "attest" to their servicer that they are suffering a financial hardship.
10  During the forbearance period, servicers cannot charge borrowers additional fees,
11  penalties, or interest. Additionally, servicers are required to cease any foreclosure
12  activities for a period of at least 60 days beginning on March 18, 2020.

13  20.  Notwithstanding the public policy and purposed purpose of the CARES
14  Act provisions identified above—i.e. to provide economic relief to individuals and
15  businesses impacted by the COVID-19 pandemic—a U.S. Department of Housing
16  and Urban Development (HUD), Office of Inspector General (OIG) study found that
17  many services, like Shellpoint here, were giving false information that the entirety
18  of the forbearance payments would be due at the end of the forbearance period.  In
19  addition, other government agencies have also cautioned that servicers like
20  Shellpoint are not permitted to demand the entirety of a CARES Act forbearance
21  sum at the end of the forbearance period:

22  a.  The  CFPB,  for  example,  explains
23  (https://www.consumerfinance.gov/about-us/blog/guide-coronavirus-mortgage-
24  relief-options/#repay-forbearance) that borrowers with VA loans "may enter into a
25  repayment plan to repay any past due amount within 6 months after forbearance
26  ends" among other relief.

27

28

**Class Action Complaint**

b.    The CFPB, also explains that borrowers with Fannie Mae or Freddie Mac loans are "allowed to repay past due amount within 12 months after forbearance ends" among other relief.

21.    Shellpoint disregards the standard industry practice for CARES Act or COVID-19 forbearance plan to not demand all forbearance payments at the end of the forbearance agreement.

22.    In addition, Shellpoint also understands and is aware that it is widely recognized in the secondary mortgage market that much of the loan data transferred by other mortgage entities to it is inaccurate as exemplified by the following:

    a. The Mortgage Servicing Collaborative ("MSC") of the Urban Institute's Housing and Finance Policy Center has identified in its comprehensive report, *The Case for Mortgage Servicing Data Standards* (Urban Institute, 2018) (the "MSC Report) that "[D]uring the foreclosure crisis when hundreds of billions of dollars of servicing portfolios were transferred from one servicer to another in a short period…Some [transfers between servicers] were affected by widespread data errors that led to borrower harm through missed opportunities for loss mitigation, misapplication of escrow payments, or erroneous fees. Servicers incurred significant financial costs, penalties, and reputational harm." *Id.* at 6 (citations omitted).

    b. A 2017 market survey of the servicing industry conducted by the Federal Housing Finance Agency, i.e.

*Future of Mortgage Servicing: Market Survey Results* (Apr. 2018), identified the known challenges faced by the mortgage servicing market including that "[a]pproximately 60% of respondents indicated the key challenges for servicing transfers are ensuring data accuracy and completeness, and minimizing

borrower impacts." *Id.* at 6.  More specifically the FHFA survey found,

- Respondents stated that varied data and document standards followed by different servicers leads to data inconsistencies and gaps during the [Mortgage Servicing Rights (MSR)] transfer process.

- Respondents also expressed that system limitations inhibit the ability to effectively execute MSR transfers.

- Servicer transfer processes can be manual and time consuming with the need to map every data field, even when transferring to the same servicing system.

- 50% of nonbanks also highlighted document custody as one of

    their top three challenges in transferring servicing.  *Id.*

c. The credit rating agencies who review the secondary mortgage market of residential mortgage-backed securities for investors also account that loans available on the secondary market are characterized by "impaired payment histories [which impact]…the servicer's ability to foreclose and liquidate the property." FitchRatings: Structured Finance, U.S. RMBS Non-performing Loan Criteria – Effective Aug. 12, 2016 to Dec. 1, 2016 at Page 6.

23.   The problems involved in the integrity of loan data in servicing transfers is well known by state-based regulators (including Shellpoint's regulators as a licensed mortgage servicer) as well.  *See e.g.* Conference of State Bank Supervisors' Proposed Regulatory Standards for Non-Bank Mortgage Servicers at Page 5, 11 ("Regulators and the industry have also recognized widespread data quality and integrity issues, especially in the context of transferring servicing rights. Non-bank mortgage servicers often struggle to integrate acquired loan portfolios,

**Class Action Complaint**

1   and to locate legal and collateral documents associated with the transferred loans.
2   All of these issues are exacerbated if a servicer's operational capacity has not kept
3   pace with its growth…[these issues involve not only] data mapping problems so
4   often experienced during a large transfer, but also the compatibility of the data").

5       24.     A former nationwide mortgage servicer, i.e. Ditech Financial LLC
6   ("Ditech") f/k/a Green Tree Servicing LLC, is currently in Chapter 11 Bankruptcy
7   Proceedings in the United States Bankruptcy Court for the Southern District of New
8   York (Case No. 19-10412).  Before filing for bankruptcy protection, Ditech was well
9   known to have utilized incorrect and unreliable mortgage data related to the
10  residential loans it serviced including some loans of the putative class members
11  acquired by Shellpoint's affiliates within 24 months of this filing.   This is
12  exemplified as follows:

13          a.     The CFPB filed a complaint Ditech on this basis in the United
14  States District Court for the for the District of Minnesota (Case No. 15-2064)
15  addressing Ditech's inaccurate mortgage, record keeping practices and many related
16  issues.

17          b.     In the June 17, 2019 Asset Purchase Agreement in which
18  Shellpoint's parent, NRZ, acquired Ditech's MSRs, including the right to collect
19  upon the certain of the class members' loan in this action, did not provide adequate
20  representations and warranties to NRZ and Shellpoint that the data transferred to it
21  was accurate and/or reliable.    Further, NRZ and Shellpoint knew Ditech's
22  bankruptcy was due in part to its systems failures and inability to manage mortgage
23  loan servicing functions without cutting corners that led to inaccurate data, record
24  keeping practices, and other related issues.

25      25.     On or before November 1, 2019 Shellpoint also knowingly acquired
26  the servicing rights to certain putative class member loans with knowledge that its
27  predecessor servicer—i.e. Servis One, Inc. d/b/a BSI Financial Services ("BSI") has
28  been subject to regulatory and private enforcement actions in which it has been

**Class Action Complaint**

1   disclosed that BSI's mismanagement of mortgage loans it services, including

2   Richard's Loan, has been subjected to multiple erroneous errors.  These publicly

3   available actions and disclosures by BSI include:

4         a.    On May 15, 2019, BSI entered into a stipulation and Consent

5   Order with the Consumer Financial Protection Bureau ("CFPB") related to its

6   mortgage servicing and transfer practices in which it was in which the CFPB found

7   and concluded BSI had routinely transferred to subsequent servicers mortgage loan

8   data information that was incomplete and ensured that the information and

9   documents transferred was accurate.

10        b.    In the matter of *Graham v. Servis One, Inc.*, pending in the

11  United States District Court for the Eastern District of Pennsylvania (Case No. 2:18-

12  cv-4377) it has been disclosed that a coding error in BSI's electronic systems related

13  to certain borrowers caused it to send inaccurate statements to borrowers from May

14  1, 2018 to November 1, 2019.

15        26.   On or before February 1, 2020 Shellpoint also knowingly acquired the

16  servicing rights to Plaintiff Maldonado's and certain putative class members' loans

17  with knowledge that its predecessor servicer—i.e. Bayview Loan Servicing, LLC

18  ("Bayview") has also been subject to regulatory enforcement actions in which it has

19  been disclosed that Bayview's mismanagement of mortgage loans it services,

20  including the Plaintiff Maldonado's Loan, has been subjected to multiple erroneous

21  errors.  These publicly available actions and disclosures by Bayview include:

22        a.    The State of Minnesota's Department of Commerce identified

23  that Bayview refused to terminate certain fees and charges it imposed on mortgage

24  borrower accounts based on its inaccurate and incomplete records until the State

25  began an investigation of it.  *See* Consent Order, *In the Matter of Bayview Loan*

26  *Servicing, LLC*  (File No. 47353/JPA)(dated 6/21/19).

27        b.    The State of Washington's Department of Financial Institutions

28  Division of Consumer Services found that Bayview failed to properly follow the

**Class Action Complaint**

1    State's foreclosure process based upon its inaccurate and incomplete records.  *See*

2    Final Cease and Desist Order, *In the Matter of Bayview Loan Servicing, LLC* (Case

3    No. C-19-2685-19-FO01)(dated 1/16/18).

4         27.    As part of its routine business practice that its parent corporation, NRZ,

5    freely advertises on its website (*see* ¶ 12 *supra*) Shellpoint imposes, churns, and

6    collects a variety of collection and default fees related to the Plaintiff's and class

7    members' mortgage accounts including late fees, property valuation fees, property

8    inspection fees, breach letter fees, etc.  Under the CARES Act, Shellpoint is not

9    permitted to impose these fees on CARES Act/COVID-19 forbearance borrowers.

10                 ***Factual Allegations Relevant to Plaintiff Maldonado***

11        28.    In or about 1999, Maldonado acquired the Maldonado Property, by

12   Deed recorded in the land records for San Bernardino County, California.   To

13   acquire the Maldonado Property, Maldonado's borrowed funds that were utilized

14   entirely for household, family and personal purposes.

15        29.    On or about July 26, 2007 Maldonado refinanced his original, mortgage

16   loan with Countrywide Home Loans n/k/a Bank of America, NA ("Maldonado

17   Loan").  The proceeds of the Maldonado Loan were used entirely for household,

18   family and personal purposes.

19        30.    The Maldonado Loan was modified on or about July 14, 2014.  At all

20   times the Maldonado Loan was utilized by Maldonado exclusively for household,

21   family and personal purposes. The Maldonado Loan qualified as a federally related

22   mortgage at its origination.  The Maldonado loan is also a federally back mortgage

23   loan as that terms is defined and utilized in Section 4022 of the CARES Act.

24        31.    Until January 31, 2020, Bayview acted as the mortgage servicer of the

25   Maldonado Loan.

26        32.    Effective February 1, 2020 the servicing rights to the Maldonado Loan

27   transferred from Bayview to Shellpoint.  At this time and before based upon its own

28   records, Shellpoint believed the Maldonado Loan to be in default based upon its

**Class Action Complaint**

1    understanding of the terms and conditions of the loan.  Shellpoint memorialized this

2    understanding in a monthly periodic statement to Maldonado dated February 16,

3    2020 in which it stated his contractual due date was February 1, 2020 and he was

4    overdue on the Maldonado Loan. In this same statement, Shellpoint admitted that it

5    is a "debt collector" seeking to collect upon "a debt."

6        33.    Bayview's mortgage operations have been subject to regulatory and

7    private enforcement actions in which it has been disclosed that Bayview's

8    mismanagement of mortgage loans it services, including the Maldonado Loan, has

9    been subjected to multiple erroneous errors.  *See* ¶¶ 24-27 *supra*.

10       34.    At all times relevant to this action, Shellpoint has had record and/or

11   actual knowledge of Bayview's mortgage servicing errors identified in ¶ 26 *supra*

12   but has taken no reasonable steps to inquire about the accuracy of loan data it

13   received from Bayview related to Maldonado or any other former Bayview borrower

14   whose loan was transferred to it.

15       35.    At all times relevant to this action, Shellpoint has had record and/or

16   actual knowledge of the factual allegations identified in the previous paragraph but

17   still has taken no reasonable steps to inquire about the accuracy of loan data it

18   received from Bayview related to Maldonado or any other former Bayview borrower

19   whose loan was transferred to it.  Instead it has simply utilized that incorrect

20   information and adopted it into its own records thereby infecting the accuracy of the

21   loan account it manages related to Maldonado and the Maldonado Loan.

22       36.    In addition, Shellpoint was also aware at the time of the servicing

23   transfer that Bayview's records were prone to errors and contained irregularities

24   including that Bayview had not regularly sent on-time periodic statements to

25   Maldonado but Maldonado. Shellpoint, nevertheless, as part of its custom and

26   practice boarded the information it received from Bayview for Maldonado's Loan.

27       37.    Notwithstanding Bayview's irregular periodic statement practices (i.e.

28   not sending statements at the same time each month and sometimes sending multiple

**Class Action Complaint**

statements in a month or sending statements after or on the grace period subject to the loan), Maldonado had been making payments to Bayview (sometimes late where he would incur a late fee).   Further, Bayview did not charge Maldonado with fees and charges (other than some late fees) and did not impose upon him property inspection fees as a way to rack up its profits on the loan and instead it had waived any rights it might have had to the fees before the servicing transfer to Shellpoint.

38.   However, almost immediately upon the transfer of the Maldonado Loan to it, Shellpoint, pursuant to the direction of its parent company, i.e. NRZ, began churning fees and making advances related to borrowers without a reasonable basis to do so.

39.   At the time of servicing transfer to Shellpoint, Shellpoint believed the Maldonado Loan was in default and it also did not timely notify Maldonado of the transfer as required by 12 U.S.C.A. § 2605(c)("Hello Letter").   Instead, Maldonado was not provided the Shellpoint notice required by 12 U.S.C.A. § 2605(c) until February 27, 2020 when it was provided by Shellpoint in untimely correspondence. In this untimely notice, Shellpoint admitted that it was required to send the notice "at least 15 days" before or after the transfer date.  In this untimely notice, Shellpoint also admitted that it is a "debt collector" seeking to collect upon "a debt" in the notice.  The notice provided by Shellpoint was materially defective in that it was:

a.   Although it was dated February 14, 2020, it was not post-marked until February 17, 2020—after the time required for the notice pursuant to 12 U.S.C.A. § 2605(c).

b.   Dated February 14, 2020 but was not delivered to Maldonado by Shellpoint until February 27, 2020—after the time required for the notice pursuant to 12 U.S.C.A. § 2605(c).

40.   Shellpoint is not permitted to backdate any correspondence required by 12 U.S.C. § 2605 and regulations related thereto and is required to timely communicate with borrowers.

**Class Action Complaint**

41.     Upon information and belief, Shellpoint had reason to know that it is sending untimely correspondence to borrowers like Maldonado because its' contractual relationship with various mail vendors specifies that it must pay more money to timely send correspondence to borrowers and Shellpoint instead elected to not pay the premium fee that would have been imposed by its vendor but to act unfair, deceptively and unconscionably but permitting its vendor to back-date correspondence in violation of the requirements in 12 U.S.C.A. § 2605(c).

42.     Since it became the servicer for the Maldonado loan and began utilizing the infected mortgage data it received from Bayview without any reasonable verification, <u>Shellpoint imposed</u> and/or collected the following fees and charges (other than principle, interest, and taxes) onto Maldonado's loan account:

| | Description | Trans. Date | Amount |
|---|---|---|---|
| a. | Property Inspection | 3/17/21 | $13.00 |
| b. | Property Inspection | 3/1/21 | $13.00 |
| c. | Property Inspection | 4/27/21 | $13.00 |
| d. | Property Inspection | 4/3/21 | $13.00 |
| e. | Property Pres Payment (Bayview) | 3/3/20 | $110.00 |
| f. | Late Charge (Bayview) | 1/20/20 | $86.68 |

43.     The fees and charges imposed identified in the preceding paragraph are actual damages to Maldonado in that Shellpoint was not entitled to impose for the following reasons:

a.     Bayview had waived any right to collect any property inspection fees from Maldonado (if it had such right) by not claiming them due when it was the servicer of the Maldonado Loan and it is simply unfair, deceptive, and unconscionable for Shellpoint to assert greater rights than its predecessor Bayview had in the Maldonado Loan since these purported fees were waived previously.

**Class Action Complaint**

1    b. Shellpoint had no right to impose further late fees on the
2 Maldonado Loan that were already paid and collected by Bayview before the
3 servicing transfer.

4    c. On April 14, 2020, Shellpoint entered into a COVID-19
5 forbearance agreement with Maldonado concerning the Maldonado Loan in light of
6 the reduction of household income for a three-month period where it agreed to
7 forbear receipt payments on the Maldonado Loan until July 2020.  In light of this
8 agreement by Shellpoint's authorized agent Pamela Spry on April 14, 2020 it is
9 simply unfair, deceptive, and unconscionable for Shellpoint to churn additional
10 default fees and costs onto the Maldonado Loan when it has no reasonable basis to
11 assume the Maldonado Property is abandoned or in disrepair—and the default fees
12 added by Shellpoint are also barred by the CARES Act.

13  44. Upon information and belief, the errors and improper charges by
14 Shellpoint are directly the result of NRZ's business practices in relation to the MSRs
15 it has acquired from another to churn all sorts of non-bona fide fees and advances
16 which it will recoup under its business model since these fees and "are almost always
17 'top of the waterfall' in the event of a property sale."

18  45. As a direct and proximate result of Shellpoint's adoption and utilization
19 of mortgage data related to the Maldonado Loan which has errors and without any
20 reasonable verification or a policy and practice to even correct the errors it detects,
21 Shellpoint has harmed Maldonado by not conveying accurate and timely disclosures
22 and imposing and collecting fees and charges from the Maldonado.  Maldonado has
23 also suffered informational injuries as a result of Shellpoint's conduct related to
24 information Congress found to be relevant and material under Federal laws.
25 Shellpoint's failure to convey the necessary information created uncertainty and fear
26 for Maldonado who was denied the information required by Congress to be
27 necessary in the mortgage servicing arena and were vital to the successful
28 achievement of the goals intended for the remedial laws at issue and are the ones

**Class Action Complaint**

most critical for consumers, without which consumers suffer the most significant harm or risk of harm.   Congress could not have given a clearer indication of its determination that this informational injury creates a material case or controversy by permitting Maldonado to recover statutory damages as a result of the violations subject to this action.

**CLASS ALLEGATIONS**

46.     The Named Plaintiff brings certain claims, *infra*, on behalf of classes of similarly situated persons related to Defendant Shellpoint under Fed. R. Civ. P. 23 defined as follows:

a.     **Untimely Hello Letter Class:**  Maldonado proposes, as the definition of the Untimely Hello Letter Class, that it be defined as follows:

> Those persons who are residents in the states which are within the jurisdiction of the United States Courts of Appeals for the Fifth, Eighth, Ninth and Tenth Circuits for whom: (i) Shellpoint provided a 12 U.S.C.A. § 2605(c) notice in the three years preceding the filing of this action; and (ii) In relation to their personal, residential mortgage loan.

b.     **Untimely Notice Class:** Maldonado also proposes, as the definition of the Untimely Notice Class, that it be defined as follows:

> Those persons who are residents in the states which are within the jurisdiction of the United States Courts of Appeals for the Fifth, Eighth, Ninth and Tenth Circuits for whom: (i) Shellpoint acquired the servicing and collection rights on their personal, residential mortgage loans no longer than one year before May 4, 2020; (ii) When it believed the mortgage loan to be in default or otherwise delinquent for 30 or more consecutive days at the time Shellpoint began servicing or collecting upon it; (iii) It

**Class Action Complaint**

provided 12 U.S.C.A. § 2605(c) notice substantially similar to the one provided to the Named Plaintiff; and (iii) It attempted or did collect alleged fees incurred before the servicing transfer to Shellpoint.

c.    **COVID-19 Class**: Maldonado proposes, as the definition of the COVID-19 Class, that it be defined as follows:

Those persons who are residents of the United States for whom:

1. Shellpoint acquired the servicing and collection rights on their personal, residential mortgage loans on behalf of another when it believed the mortgage loan to be in default or otherwise delinquent for 30 or more consecutive days at the time Shellpoint began servicing or collecting upon it;

2. Shellpoint agreed to a COVID-19 forbearance agreement for any period of time from April through December 2020 related to those individual's residential mortgage debts; and

3. Within the twelve months preceding this action Shellpoint imposed or attempted to collect fees and charges beyond the contractual (principal, interest, and/or escrow) payments due on the individual's account.

d.    **California Class**: Maldonado proposes, as the definition of the California Class, that it be defined as follows:

All persons with a California address who were (i) charged with a fee by Shellpoint upon a servicing transfer to it that was waived

**Class Action Complaint**

by Shellpoint's predecessor or (ii) charged a default fee by Shellpoint while their loan was subject to a COVID-19 forbearance agreement during the applicable statutes of limitations for Plaintiff's non-FDCPA claims through the date a class is certified.

47.    Maldonado qualifies as a member of the Untimely Hello Letter Class, the Untimely Notice Class, COVID-19 Class, and California Class and proposes to be appointed by the Court as the Named Plaintiff for the Untimely Hello Letter Class, Untimely Notice Class, and COVID-19 Class.

48.    Excluded from each of the putative classes are any person who falls within the definitions if the person is (i) an employee or independent contractor of the Shellpoint; (ii) a relative of an employee or independent contractor of the Shellpoint; or (iii) an employee of the Court where this action is pending.

49.    The Class definitions in ¶ 46 as limited by ¶ 48 may be amended or modified from time to time.

50.    The members of the (i) Untimely Hello Letter Class, (ii) Untimely Notice Class, (iii) COVID-19 Class, and (iv) California Class (collectively "Putative Classes") are capable of being described without difficult managerial or administrative problems.  The members of each putative class are also readily identifiable from the information and records in the possession or control of Shellpoint or its affiliates and agents and from public records.  Shellpoint is required to maintain this information for the entire class period.

51.    The Putative Classes are sufficiently numerous, consisting of more than one hundred persons each, that individual joinder of all members is impractical. This allegation is based on a data search of public records which identify that thousands of public complaints have been filed against Shellpoint and it services thousands of residential, mortgage loans throughout the United States, Shellpoint

**Class Action Complaint**

has an interest in hundreds of consumer, mortgage loans that were in default or believed to be in default during the class period.

52.   There are questions of law and fact common to the Putative Classes which predominate over any questions affecting only individual members of the putative classes and, in fact, the wrongs alleged against Shellpoint by the Putative Class members and the remedies sought by Named Plaintiff and the putative class members against the Shellpoint are identical.

53.    These common questions of law or fact for the Untimely Hello Letter Class members include but are not limited to:

a.    whether Shellpoint has a legal duty to provide to the class members a timely Hello Letter pursuant to 12 U.S.C.A. § 2605(c);

b.    whether Shellpoint has any policy and actual practice and procedure to identify correct mailing addresses for borrowers with whom it receives return mail from the United States Postal Service to ensure notices required by 12 U.S.C.A. § 2605(c) are provided to borrowers;

c.    whether Shellpoint has any policy and actual practice and procedure to ensure it is receiving accurate information to its predecessor servicers as required by 12 C.F.R. § 1024.38(b)(4)(ii);

d.    whether Shellpoint is entitled to impose and/or collect fees and charges from borrowers who have not received a timely 12 U.S.C.A. § 2605(c) notice;

e.    whether Shellpoint has a pattern and practice of violating 12 U.S.C.A. § 2605.

f.    Whether Shellpoint's conduct violated the RESPA;

g.    Whether the members of the class are entitled to fees imposed and/or collected upon their accounts from Shellpoint as actual damages; and

**Class Action Complaint**

h.   Whether the members of the class are entitled to additional statutory damages as a result of Shellpoint's pattern and practice of violating RESPA.

54.   These common questions of law or fact for the Untimely Notice Class members include but are not limited to:

a.   whether Shellpoint has a legal duty to ensure notices sent by it, including notices pursuant to 12 U.S.C.A. § 2605(c), 15 U.S.C.A. § 1638(f), and 12 C.F.R. § 1026.41, are sent to the correct address(es) for the consumer;

b.   whether Shellpoint has a legal duty to provide to the class members a timely periodic statement pursuant to 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41;

c.   whether Shellpoint has any policy and actual practice and procedure to identify correct mailing addresses for borrowers with whom it receives return mail from the United States Postal Service to ensure notices required by 12 U.S.C.A. § 2605(c), 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41are provided to borrowers;

d.   whether Shellpoint has any policy and actual practice and procedure to ensure it is receiving accurate information to its predecessor servicers as required by 12 C.F.R. § 1024.38(b)(4)(ii);

e.   whether Shellpoint is entitled to impose and/or collect fees and charges from borrowers who have not received a timely 12 U.S.C.A. § 2605(c), 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41 notices or were otherwise waived by its predecessor(s);

f.   Whether Shellpoint is a "debt collector" as that term is defined under the FDCPA;

g.   Whether Shellpoint's conduct violated the FDCPA;

**Class Action Complaint**

h.  Whether the members of the class are entitled to the fees and charges collected from them without receiving the timely notices required by 12 U.S.C.A. § 2605(c), 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41 as actual damages; and

i.  Whether the members of the class are entitled to additional statutory damages as a result of the frequency, persistence, and intentionality of Shellpoint's conduct.

55.  These common questions of law or fact for the COVID-19 Class members include but are not limited to:

a.  Whether it is unfair, deceptive, or unconscionable for Shellpoint to impose additional default fees and charges onto borrower accounts after it has agreed to a COVID-19 forbearance plan;

b.  Whether it is unfair, deceptive, or unconscionable for Shellpoint to impose and demand payment of the entire payments subject to a COVID-19 forbearance plan at the end of the forbearance period;

c.  Whether Shellpoint's conduct violated the FDCPA;

d.  Whether the members of the class are entitled to the fees and charges imposed on them during their COVID-19 forbearance plan by Shellpoint as actual damages; and

e.  Whether the members of the class are entitled to additional statutory damages as a result of the frequency, persistence, and intentionality of Shellpoint's conduct.

56.  These common questions of law or fact for the California Class members include but are not limited to:

a.  Shellpoint violated the Rosenthal Act or the California Unfair Practices Act by imposing and collecting fees and charges its predecessor(s) had waived; and

**Class Action Complaint**

b.     Whether Shellpoint violated the Rosenthal Act or the California Unfair Competition Law by imposing and collecting default fees and charges during a COVID-19 forbearance period governing the loans.

57.    Shellpoint's defenses (which defenses are denied) would be typical or identical for each of the member of the (i) Untimely Hello Letter Class, (ii) Untimely Notice Class, (iii) COVID-19 Class, and (iv) California Class will be based on the same legal and factual theories.

58.    Certification of the (i) Untimely Hello Letter Class, (ii) Untimely Notice Class, (iii) COVID-19 Class, and (iv) California Class under Fed. R. Civ. P. 23 is appropriate as to the members of each putative class in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy.

59.    A class action will cause an orderly and expeditious administration of claims by the members of the (i) Untimely Hello Letter Class, (ii) Untimely Notice Class, (iii) COVID-19 Class, and (iv) California Class and economies of time, effort and expenses will be fostered and uniformity of decisions will be insured.

60.    The only individual questions concern the identification of members of the (i) Untimely Hello Letter Class, (ii) Untimely Notice Class, (iii) COVID-19 Class, and (iv) California Class.  This information can be determined by a ministerial examination of public records or from Shellpoint's business records or other sources, which are admissible as an exception to the hearsay rule and as a statement by a party.

61.    Maldonado's class claims are typical of the claims of the ((i) Untimely Hello Letter Class, (ii) Untimely Notice Class, (iii) COVID-19 Class, and (iv) California Class members pursuant to Fed. R. Civ. P. 23 since they are based on and arise out of identical facts constituting the wrongful conduct of the Shellpoint.

62.    Maldonado will also fairly and adequately represent and protect the interests of the (i) Untimely Hello Letter Class, (ii) Untimely Notice Class, (iii)

**Class Action Complaint**

COVID-19 Class, and (iv) California Class.  Maldonado is similarly situated with, and has suffered similar injuries as, the putative classes he proposes to represent. He has also retained counsel experienced in consumer class actions including actions involving unlawful collection and mortgage servicing practices.  Maldonado does not have any interests which might cause him not to vigorously prosecute this action or are otherwise averse to the interests of the members of the ((i) Untimely Hello Letter Class, (ii) Untimely Notice Class, (iii) COVID-19 Class, and (iv) California Class.  He feels he and the putative class members have been wronged, wishes to obtain redress of the wrong, and wants Shellpoint stopped from failing to comply with its mandatory duties that form the basis of the class claims.

63.     The (i) Untimely Hello Letter Class, (ii) Untimely Notice Class, (iii) COVID-19 Class, and (iv) California Class members have suffered actual damages, losses, and harm similar those sustained by Maldonado.

## COUNT I:  VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT
### ("RESPA"), 12 U.S.C.A. § 2605
**(On behalf of the Named Plaintiff Individually and on behalf of the Untimely Hello Letter Class against Shellpoint)**

64.     The Named Plaintiff adopts by reference the factual allegations contained in the preceding paragraphs of this Complaint with the same effect as if herein fully set forth.  This claim is brought on behalf of Maldonado individually and on behalf of the Untimely Hello Letter Class members against Shellpoint.

65.     The Named Plaintiff and Untimely Hello Letter Class members are "borrowers" entitled to the protections codified at 12 U.S.C.A. § 2605.

**Class Action Complaint**

66.     Shellpoint is a mortgage servicer subject to the mandatory requirements of 12 U.S.C.A. § 2605 in relation to the Named Plaintiff and Untimely Hello Letter Class members.

67.     Pursuant to 12 U.S.C.A. § 2605(c), Shellpoint had a legal duty to timely "notify the borrower of any such assignment, sale, or transfer…not more than 15 days after the effective date of transfer of the servicing of the mortgage loan."

68.     Disregarding its mandatory duties in 12 U.S.C.A. § 2605(c), Shellpoint did not provide timely notice to the Named Plaintiff and the Untimely Hello Letter Class members.

69.     In addition, upon information and belief Shellpoint had notice that its purported 12 U.S.C.A. § 2605(c) notices were not timey delivered to the Named Plaintiff and the Untimely Hello Letter Class members from the United States Postal Service and other customary sources (including from its predecessor(s) and vendor(s) utilized for notice purposes) but it took no action to use that notice to resend 12 U.S.C.A. § 2605(c) notices to corrected addresses for the borrowers and ensure the notices were timely sent.

70.     As a direct and proximate result of Shellpoint's untimely notices pursuant to 12 U.S.C.A. § 2605(c), the Untimely Hello Letter Class members, the Named Plaintiff and the class members have been damaged by Shellpoint's imposition and collection of fees and charges onto their accounts transferred to Shellpoint but Shellpoint has concealed its timely identity in the form required by § 2605(c).

71.     Upon information and belief, based upon the experiences of the Named Plaintiff and those described in an Amended Complaint filed in the Circuit Court for Anne Arundel County, Maryland styled *White v. NewRez LLC   d/b/a Shellpoint Mortgage Servicing* (Case No. C-02-CV-20-001060) and an Amended Complaint filed in the *Richards Action* and the servicing transfer of a residential mortgage loan to Shellpoint from Quicken Mortgage related to Jane C. Murphy

**Class Action Complaint**

1   (loan ending in 4887 in relation to 4458 World Farm Road in Oxford, MD  21654)

2   in which Shellpoint admitted to multiple servicing errors but failed to respond to the

3   borrower's QWR/Notice of Error as required by § 2605), Shellpoint has a pattern

4   and practice of noncompliance with the requirements of 12 U.S.C.A. § 2605 and its

5   implementing regulations for borrowers like the Named Plaintiff and Untimely

6   Hello Letter Class members including as of April 11, 2020 there are more than three

7   thousand public complaints against Shellpoint in the CFPB's complaint database

8   which concern or related to its mortgage business subject to § 2605(c).  Within those

9   complaints are approximately more than 50 related to various disclosure problems

10  related to Shellpoint.

11  ### COUNT II: VIOLATIONS OF THE FAIR DEBT COLLECTION

12  ### PRACTICES ACT

13  **("FDCPA"), 15 U.S.C. § 1692, *et seq.***

14  **(On behalf of the Named Plaintiff Individually and**

15  **on behalf of the Untimely Notice Class against Shellpoint and on behalf**

16  **the COVID-19 Class)**

17  72.    The Named Plaintiff adopts by reference the factual allegations

18  contained in the preceding paragraphs of this Complaint with the same effect as if

19  herein fully set forth.  This claim is brought on behalf of Maldonado individually

20  and on behalf of the Untimely Notice Class members against Shellpoint.  This claim

21  is also brought on behalf of Maldonado individually and on behalf of the COVID-

22  19 Class members against Shellpoint.

23  73.    Shellpoint acquired its interest in the loans of the Untimely Notice

24  Class and COVID-19 Class members when it alleges (directly and indirectly) and

25  believed the loans were in default for the purposes of collection on behalf of another

26  and therefore Shellpoint is a Debt Collector within the meaning of 15 U.S.C. §

27  1692a(6).

28

**Class Action Complaint**

74.     Shellpoint, as part of its debt collection activities in relation to the Untimely Notice Class members, has statutory duties to send notices to the plaintiff and class members pursuant to 12 U.S.C.A. § 2605(c).  As described herein, it failed to send timely notices to the plaintiff and Untimely Class members or even reasonably attempt to forward those notices once it had reason to know they were not delivered or were untimely sent.

75.     Shellpoint, as part of its debt collection activities in relation to the COVID-19 Class members, has statutory and legal duty to not act unfairly, deceptively, or unconscionably in entering into COVID-19 forbearance agreements with the COVID-19 Class members by agreeing to forbear payments for agreed upon periods of time with the class members in which it continued to impose and collecting default fees like property inspection fees from the class members.  These practices are in violation of 15 U.S.C. § 1692f.

76.     In relation to the Plaintiff and the Untimely Notice Class members, Shellpoint is also a debt collector pursuant to 15 U.S.C. §1692a(6) because its principal business activity utilizes instrumentalities of interstate commerce or the mails related to the enforcement of security interests as described in 15 U.S.C. §1692f(6) which bars certain debt collectors, like them, from threatening to take any nonjudicial action to effect dispossession of property when there is no present right to possession of the property claimed as collateral when the debt collection action is barred as a matter of law.

77.     By failing to provide the Plaintiffs and the Untimely Notice Class members with timely Hello Letters pursuant to 12 U.S.C.A. § 2605(c) while charging fees and other charges to their loans, Shellpoint has acted unfairly or with unconscionable means to collect or attempt to collect from the Plaintiffs and the Untimely Notice Class members in violation of 15 U.S.C. § 1692f.  Alternatively by failing to use reasonable procedures and practices to either (i) ensure the addresses it purports to mail such notices are correct, (ii) its disclosure are timely sent, or (iii)

**Class Action Complaint**

1  updated when it receives notice from the United States Postal Service of non-
2  delivery while continuing to charge fees and other charges to Untimely Notice Class
3  members' loans, Shellpoint has acted unfairly or with unconscionable means to
4  collect or attempt to collect from the Plaintiffs and the Untimely Notice Class
5  members in violation of 15 U.S.C. § 1692f.

6      78.    Plaintiffs and the Untimely Notice Class members have suffered actual
7  economic and non-economic damages, as more fully described *supra* as a result of
8  the Shellpoint's illegal debt collection practices and direct and indirect actions
9  described herein including the imposition of fees and charges imposed by Shellpoint
10  that had been waived by its predecessor(s).

11      79.    The FDCPA provides for statutory damages in addition to actual
12  damages.  The Plaintiff and the Untimely Notice Class and the COVID-19 Class
13  members are entitled to their actual damages and statutory damages allowed under
14  the FDCPA.

15      80.    Shellpoint's net worth is in excess of $50,000,000.00.

16  **COUNT III: VIOLATIONS OF THE ROSENTHAL ACT (CAL. CIV.**
17  **CODE §§ 1788 *et seq) AND THE* "UNLAWFUL" PRONG OF THE**
18  **CALIFORNIA UNFAIR PRACTICES ACT §§ 17000, 17200 *et seq.* ("UCL")**
19  **(On behalf of the Named Plaintiff Individually on behalf of the California**
20  **Class)**

21      81.     The Named Plaintiff adopts by reference the factual allegations
22  contained in the preceding paragraphs of this Complaint with the same effect as if
23  herein fully set forth.  This claim is brought on behalf of Maldonado individually
24  and on behalf of the California Class members against Shellpoint.

25      82.     The Rosenthal Act applies to Shellpoint because it regularly engages
26  in debt collection within California. Cal. Civ. Code § 1788.2(c).

27

28

**Class Action Complaint**

83.   Maldonado purchased and refinanced his home by residential mortgage for personal, family or household use and is a person who incurred a consumer debt. Cal. Civ. Code § 1788.2(e), (f).

84.   Plaintiff's mortgage was at all relevant times due and owing, for the reasons stated above.

85.   By collecting and attempting to collect fees and charges allegedly incurred by its predecessor(s) who had not sought to collect them and otherwise waived a right to do so from Plaintiff and members of the California Class, Shellpoint unfairly and unconscionably sought to collect sums in violation of § 1692f of the FDCPA.

86.   By collecting and attempting to default fees and charges after agreeing to COVID-19 forbearance agreements with the Plaintiff and California Class members before the end of the forbearance period, Shellpoint also unfairly and unconscionably sought to collect sums in violation of § 1692f of the FDCPA.

87.   The Rosenthal Act makes it illegal for any entity covered by it to engage in conduct prohibited by the FDCPA. Cal. Civ. Code § 1788.17. By engaging in conduct prohibited by the FDCPA, Shellpoint violated the Rosenthal Act in relation to Plaintiff and the California Class.

88.   Moreover, by collecting and attempting to collect (i) fees and charges waived by its predecessors or (ii) default fees imposed and collected during an agreed upon COVID-19 forbearance agreements agreed to pursuant to the CARES Act, that were not otherwise permitted by law from Plaintiff and class members, Shellpoint violated the Rosenthal Act's prohibition against "(b) Collecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law." Cal. Civ. Code § 1788.14.

**Class Action Complaint**

89.     By assessing (i) fees and charges waived by its predecessors or (ii) default fees imposed and collected during an agreed upon COVID-19 forbearance agreements agreed to pursuant to the CARES Act, that were not otherwise permitted by law from Plaintiff and California Class members, Shellpoint represented to Plaintiff and members of the California Class that their debts may be increased by the additional fees and charges of the Pay-to-Pay fees, even though the fees and charges may not be legally added to the existing obligation. These representations violated the Rosenthal Act's prohibition against representing that a consumer debt "may be increased by the addition of . . . charges if, in fact, such fees and charges may not be legally added to the existing obligation." Cal. Civ. Code § 1788.13(e).

90.     Shellpoint's assessment of (i) fees and charges waived by its predecessors or (ii) default fees imposed and collected during an agreed upon COVID-19 forbearance agreements agreed to pursuant to the CARES Act against Plaintiff and members of the California Class knowingly and/or willfully. Shellpoint has received regularly guidance from its license agencies about such unfair and deceptive practices and it also knows the law.  Further, its knowledge is demonstrated by its consistent and uniform practice to impose fees previously waived by its predecessors and during a COVID-19 forbearance agreement period. As a result of each and every violation of the Rosenthal Act, Plaintiff and members of the California Class are entitled to recover from Shellpoint any actual damages pursuant to Cal. Civ. Code § 1788.30(a), statutory damages for a knowing or willful violation in the amount up to $1,000 pursuant to California Civil Code § 1788.30(b), and reasonable attorney's fees and costs pursuant to California Civil Code § 1788.30(c).

91.     The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

92.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

**Class Action Complaint**

93.    As described in detail above, Shellpoint's conduct described herein violates the Rosenthal Act. These violations are sufficient to support Plaintiff's claim under the unlawful prong of the UCL.

94.    As a result of the conduct above, Shellpoint has been unlawfully enriched at the expense of Plaintiff and members of the California Class by obtaining revenues and profits that it would not have otherwise obtained absent its unlawful conduct.

95.    Through its unlawful acts and practices, Shellpoint has improperly obtained money from Plaintiff and the members of the California Class. As such, Plaintiff requests that the Court cause Defendants to restore the money to Plaintiff and members of the California Class, and to enjoin Shellpoint from continuing to violate the UCL in the future. Otherwise, Plaintiff and members of the California Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

### PRAYERS FOR RELIEF

I.    WHEREFORE, pursuant to Count I of this Complaint, Named Plaintiff request the Court to certify the Untimely Hello Letter Class pursuant to Fed. R. Civ. P. 23 and appoint the Named Plaintiff as class representative and the undersigned counsel as Class Counsel;

II.    WHEREFORE, pursuant to Count I of this Complaint, Named Plaintiff and the Untimely Hello Letter Class members ask this Court to determine the issue of Shellpoint's liability to the Untimely Hello Letter Class members and award (i) actual damages for its violations of 12 U.S.C.A. § 2605(c) pursuant to 12 U.S.C.A. § 2605(f)(2)(A) equal to the sums imposed and collected by Shellpoint in fees and charges added to their mortgage accounts before attempting to deliver the 12

**Class Action Complaint**

U.S.C.A. § 2605(c) notices to borrowers, (ii) statutory damages pursuant to 12 U.S.C.A. § 2605(f)(2)(B) in the amount of $1,000,000, and (iii) reasonable attorney fees and reasonable costs as authorized by 12 U.S.C.A. § 2605(f)(3).

III.  WHEREFORE, pursuant to Count II of this Complaint, Named Plaintiffs request the Court to certify the Untimely Notice Class pursuant to Fed. R. Civ. P. 23 and appoint the Named Plaintiff as class representative and the undersigned counsel as Class Counsel;

IV.  WHEREFORE, pursuant to Count II of this Complaint, Named Plaintiff also requests the Court to certify the COVID-19 Class pursuant to Fed. R. Civ. P. 23 and appoints the Named Plaintiff as class representative and the undersigned counsel as Class Counsel;

V.  WHEREFORE, pursuant to Count II of this Complaint, Named Plaintiff and the Untimely Notice Class members ask this Court to determine the issue of Shellpoint's liability to the Untimely Notice Class members and award (i) actual damages for its violations of 15 U.S.C. § 1692f pursuant to 15 U.S.C.A. § 1692k(a)(1) equal to the sums collected by Shellpoint in excess of $75,000 (in an aggregated amount) in fees and charges waived by its predecessor(s) before it became the collector/servicer of the loan, (ii) statutory damages pursuant to 15 U.S.C.A. § 1692k(a)(2) in the amount of $500,000, and (iii) reasonable attorney fees and reasonable costs as authorized by 15 U.S.C.A. § 1692k(a)(3).

VI.  WHEREFORE, pursuant to Count II of this Complaint, Named Plaintiff and the COVID-19 Class members ask this Court to

**Class Action Complaint**

determine the issue of Shellpoint's liability to the COVID-19 Class members and award (i) actual damages for its violations of 15 U.S.C. § 1692f pursuant to 15 U.S.C.A. § 1692k(a)(1) equal to the default fees and sums imposed and collected by by Shellpoint in excess of $75,000 (in an aggregated amount) during a COVID-19 foreclosure plan period, (ii) statutory damages pursuant to 15 U.S.C.A. § 1692k(a)(2) in the amount of $500,000, and (iii) reasonable attorney fees and reasonable costs as authorized by 15 U.S.C.A. § 1692k(a)(3).

VII.    WHEREFORE, pursuant to Count III of this Complaint, Named Plaintiff also requests the Court to certify the California Class pursuant to Fed. R. Civ. P. 23 and appoints the Named Plaintiff as class representative and the undersigned counsel as Class Counsel;

VIII.   WHEREFORE, pursuant to Count III of this Complaint, Named Plaintiff and the California Class members ask this Court to determine the issue of Shellpoint's liability to the California Class members and award pursuant to the Rosenthal Act and UCL (i) actual damages for its violations of each law equal to the default fees and sums imposed and collected by Shellpoint in excess of $75,000 (in an aggregated amount) during a COVID-19 foreclosure plan period and the fees and charges imposed and collected by it that its predecessor(s) had waived, (ii) restitution and statutory damages, and (iii) reasonable attorney fees and reasonable costs.

IX.     WHEREFORE, Named Plaintiff also requests the Court provide such other or further relief as the Court deems appropriate including attorney fees and costs in relation to this

**Class Action Complaint**

1   Complaint.

2

3                           Respectfully Submitted,

4

5                           /s/ Scott C. Borison
                            Scott C. Borison (SBN 289456)
6                           1900 S. Norfolk St. Suite 350
                            San Mateo CA 94403
7                           (301) 620-1016
8                           Scott@borisonfirm.com

9
                            *Attorneys for Plaintiff and the Proposed Classes*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Class Action Complaint**